**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PATRICK F. GREEN, | ) | CASE NO:     4:07-cv-2028 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | NANCY A. VECCHIARELLI |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | MEMORANDUM OPINION & |
| Commissioner of Social Security, | ) | ORDER |
| | ) | |
| Defendant. | ) | |

Plaintiff Patrick F. Green ("Green") challenges the final decision of the Commissioner of

Social Security, Michael J. Astrue ("Commissioner"), denying Green's claim for Disability

Insurance Benefits ("DIB") and Social Security Income ("SSI") under Title II and Title XVI of

the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C.

§ 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is **vacated** and

**remanded**.

## I.  Procedural History

On December 1, 2003, Green filed an application for SSI and DIB, alleging a disability

onset date of June 19, 2001, and claiming he was disabled due to limitations caused by bilateral

leg pain.[1]  (Tr. 226-28, 232, 433-34.)  After his applications were denied initially and on reconsideration, Green requested an administrative hearing.[2]  (Tr. 212-20, 224-25, 435-44.)

On May 25, 2006, Administrative Law Judge, Mark C. Ramsey ("ALJ"), held a hearing during which Green, represented by counsel, testified.  (Tr. 457-81.)  In a decision dated October 13, 2006, the ALJ found that Green could perform his past relevant work despite the limitations caused by his impairment and, therefore, was not disabled.  (Tr. 18-23.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review. (Tr. 9-14.)  On July 6, 2007, Green filed a complaint in this Court, seeking judicial review pursuant to 42 U.S.C. § 405(g) and 1383(c).  (Doc. No. 1.)

On appeal, Green claims the ALJ committed the following errors:  1) the ALJ erred when he found that Green's allegations were not entirely credible because they were not supported by the medical record; 2) the ALJ erred when he found that Green could return to his past relevant work; and 3) the ALJ erred in failing to consider the limitations of Green's borderline intellectual functioning on his ability to control his disease and on his ability to function in the workplace.  (Doc. No. 14, Plaintiff's Brief at 12.)

## II.  Evidence

### Personal and Vocational Evidence

Born on April 19, 1954 and age fifty-two at the time of his administrative hearing and the

_____

[1]Green had previously filed applications for DIB and SSI in 2001.  Those applications were denied in a decision dated June 24, 2003.  (Tr. 36-44, 64-66, 188-90, 201-09.)

[2]At his administrative hearing, Green amended his disability onset date to June 25, 2003. (Tr. 463.)

ALJ's decision, Green was considered an individual approaching advanced age.  Green attended high school through tenth or eleventh grade,[3] in learning disabled classes for "slow learners." (Tr. 238.)  School records indicate that Green had an IQ of 69 in the third grade and a verbal IQ of 71, performance IQ of 94, and full scale IQ of 86 in the eighth grade.  (Tr. 129, 135.)  Green has past relevant work experience as a laborer, dishwasher, and sorter of recyclable materials. (Tr. 74.)

*Medical Evidence*

Green has coronary artery disease ("CAD") with a history of myocardial infarction in 1992.  (Tr. 322, 341.)  Evaluative catheterization performed in November 2000 revealed mild left ventricular dysfunction and occlusive coronary artery disease involving the dominant right coronary artery.  (Tr. 147- 48.)

Dr. Joseph P. Irilli performed a consultative psychological examination of Green in August 2001 in connection with Green's prior application for benefits.  (Tr. 153-59.)  Dr. Irilli's evaluation report indicates that Green "reported that he was receiving Social Security Disability Benefits from 1977 through 1994," but that his benefits were terminated because he began working while collecting benefits.  (Tr. 157.)  Dr. Irilli opined that Green's ability to relate to others was adequate; his ability to understand, remember, and follow instructions was appropriate; he seemed capable of comprehending and completing simple routine tasks; his

---

[3]In a disability report Green completed in 2003, Green indicated that the highest grade he completed was tenth grade.  (Tr. 238.)  At the hearing, when Green was asked how many years of school he had, he testified, "Eleventh, all the way to the eleventh grade."  (Tr. 459.)

3

ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks was unimpaired; and, his ability to withstand the stress and pressures associated with day-to-day work activity was seen as appropriate.  (Tr. 158-59.)  He assigned a Global Assessment of Functioning (GAF) score of 60.[4]  (Tr. 158.)

In October 2001, Dr. Padamadan performed a consultative internal medicine examination of Green in connection with Green's prior application for benefits.  (Tr. 160-63.)  Dr. Padamadan concluded that Green might need some exertional limitations for frequent heavy lifting over 50 pounds, but had no other limitations.  (Tr. 162-63.)

Green had an abdominal aortogram and bilateral lower extremity runoff test in September 2003 because of left calf claudication.  (Tr. 337.)  The abdominal aortogram revealed diffuse atherosclerotic disease of the infrarenal abdominal aorta, mild narrowing of the right common iliac artery at its origin, occlusion of the left internal iliac artery, high grade stenosis at the origin of the right internal iliac artery, and 30-40 % stenosis of the left common iliac artery.  (Tr. 337.)  Bilateral lower extremity runoff testing revealed moderate stenosis of the right common femoral artery most likely related to spasm rather than atherosclerotic disease, and an unremarkable left common femoral artery but a long segment of 40-50 % narrowing in the superficial femoral artery.  (Tr. 337.)

On February 9, 2004 Dr. Prabhudas A. Lakhani performed a consultative examination at the request of the State Agency.  (Tr. 287-94.)  Green reported the following symptoms.  For the

---

[4]A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text revision (DSM-IV-TR) 34 (2000).

past fifteen years, he suffered migraine headaches that last about a day and a half.  (Tr. 287.)  He experiences chest pain and shortness of breath when he walks for less than one block.  (Tr. 288.)  When this occurs, he takes NitroQuick, which alleviates the symptoms in ten to fifteen minutes.  (*Id*.)  After walking for half a block, he experiences intermittent claudication, which occurs in his left leg more than his right leg.[5]  (*Id*.)  It has worsened over the past year and a half.  (*Id*.)

Green's gait and ambulation were normal without an assistive device.  (*Id*.)  Pain and touch sensation were normal.  (*Id*.)  There was purplish discoloration of the left toes, and the toes of both feet were cold.  (*Id*.)  Mild to moderate variscosities were present on both legs without stasis dermatitis.  (*Id*.)  Green could not toe-touch due to pain in his thighs, and a straight leg raising test gave him pain in his thighs at 65 degrees on the right side and 55 degrees on the left side. (*Id*.)  No neurological abnormality was observed.  (*Id*.)

Dr. Lakhani diagnosed Green with arterial peripheral vascular disease, shortness of breath (likely emphysematous, but chronic obstructive pulmonary disease (COPD) should be ruled out), anginal chest pain with history of coronary artery disease, hyperlipidemia, and gastroesophageal reflux disease (GERD).  (Tr. 289-90).  He concluded, "based on objective findings, [that Green could] walk very short distances," carry five pounds due to hand pain, and possibly could not open a jar.  (Tr. 290.)  Green reported that he could not write longer than writing his signature.  (*Id*.)  Dr. Lakhani  noted that Green's memory, concentration, and

---

[5]Intermittent claudication is "a complex of symptoms characterized by pain, tension, and weakness in a limb when walking is begun, intensification of the condition until walking becomes impossible, and disappearance of the symptoms after a period of rest.  It is seen in occlusive arterial diseases of the limbs . . . ."  *Dorland's Illustrated Medical Dictionary*, 373 (30th ed. 2003).

5

understanding were good.  (*Id*.)

In April 2004, Green underwent pulmonary function studies which revealed mild restrictive ventilatory defect with early obstructive pulmonary impairment.  (Tr. 298.)

Dr. Alejandro Franco, a thoracic and cardiovascular surgeon reported to the Bureau of Disability Determination on May 4, 2004 that Green had been seen by him on March 31, 2004 for a consultation regarding his claudication secondary to atherosclerotic vascular disease.  (Tr. 307.)  Dr. Franco advised Green to continue with medical management.  (*Id*.)

On April 26, 2004, Green was seen by Dr. Atef S. Labib due to complaints of chest pain and exertional dyspnea.  (Tr. 321.)  Green reported that his walking was limited due to peripheral vascular disease ("PVD").  (*Id*.)   He also reported having headaches, dizziness, and depression. (*Id*.)  Dr. Labib diagnosed coronary artery disease, myocardial infarction in 1992, exertional angina, and hypertension.   (Tr. 322.)  Dr. Labib ordered a stress test which revealed the old scar from Green's 1992 myocardial infarction, without ischemia, and a mildly reduced ejection fraction.  (Tr. 318-19.)  At a second office visit on June 3, 2004, Dr. Labib prescribed Metroprolol.  (Tr. 317.)

On May 21, 2004, Dr. Gary W.  Hinzman, a State Agency physician completed a residual functional capacity assessment in which he concluded that Green could perform medium work.[6] (Tr. 308-14.)

In July 2004, Dr. Kollipara, a vascular surgeon, examined Green to evaluate swelling in

---

[6]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying objects weighing up to 25 pounds.  If someone can do medium work, [the SSA] determine[s] that he or she can also do sedentary and light work."  §404.1567(c).

6

Green's lower extremities.  (Tr. 346-47.)  Green reported that he could walk one to two blocks slowly or a half-block quickly.  (Tr. 346.)  He also reported that he was prescribed support stockings for edema but did not wear them because he could not afford them.  (Tr. 346.)  On examination, both femoral pulses were palpable and diminished, more so on the left.  (Tr. 347.)  Both feet were warm to the touch.  (Tr. 347.)  Ankle pulses were absent. (Tr. 347).   Green had edema of both lower extremities that was clinically consistent with lymphedema, more on the right.  (Tr. 347.)  A neurological examination was normal.  (Tr. 347.)  A Doppler study performed in August 2003 revealed evidence of left iliac and bilateral femoral-popliteal arterial occlusive disease . (Tr. 347.)  Dr. Kollipara recommended a venous ultrasound study to rule out deep vein thrombosis, with a follow-up CT study if the ultrasound was normal.  (Tr. 347.)  Dr. Kollipara strongly urged Green to stop smoking and recommended that he wear the support stockings, but Green was "extremely reluctant."  (Tr. 347.)

In August 2004, Dr. Kollipara reported that the venous ultrasound study revealed no evidence of deep vein thrombosis, and a CT scan of the abdomen and pelvis was recommended to rule out other problems.  (Tr. 345.)  Dr. Kollipara recommended that Green stop smoking, walk daily as much as possible, and return in six months.  (Tr. 345.)

Donald  Degli, M.A., performed a psychological consultative examination of Green in August 2004 at the State Agency's request.  (Tr. 348-51.)  Green presented a picture of depression and personality disorder.  (Tr. 349.)  Testing revealed a Full Scale IQ of 69, a Verbal IQ of 69, and a Performance IQ of 75.  (Tr. 349-50.)  His memory ability was consistent with his general intelligence level.  (Tr. 350.)  He did not complain of memory problems.  (Tr. 350.)  His reading was at a fifth grade level and spelling was at a third grade level.  (Tr. 350.)   Degli

diagnosed Depressive Disorder NOS, Personality Disorder NOS, and Borderline Intellectual Functioning. (Tr. 351.) He assigned Green a GAF score of 60. (Tr. 351.) He opined that Green might work meaningfully in an isolated work setting, could adequately deal with simple directions and simple or routine tasks in a low competition work setting, had impaired ability to maintain attention, concentration, persistence, and pace, and was moderately impaired in withstanding the stresses and pressures of a competitive work setting. (Tr. 351.)

In September 2004, Dr. Karen M. Terry, a State Agency psychologist, completed a mental residual functional capacity assessment on the basis of the evidence in Green's file. (Tr. 352-68.) Dr. Terry assigned great weight to the opinion of the consultative examiner, Dr. Degli. (Tr. 354.) Although Dr. Terry assessed that Green suffered from depressive disorder, borderline intellectual functioning personality disorder, none of the disorders satisfied the diagnostic criteria of the corresponding listing. (Tr. 358, 359, 362.) Dr. Terry opined that Green was moderately limited in activities of daily living, social functioning, and maintaining concentration, persistence, and pace. (Tr. 365.) She concluded that Green could do simple repetitive tasks in an environment that required him to have no more than minimal contact with the public and coworkers and had some level of supervision, could adapt to routine changes that do not occur often, and that given his IQ and mood changes, he may be able to follow very basic written instructions. (Tr. 354.) Dr. Terry opined that Green's allegations of schizophrenia and mental retardation were not supported by the medical evidence of record and were not credible. (*Id*.)

In September 2004, State Agency reviewing physician, Dr. Rebecca Neiger, opined that Green could perform medium work. (Tr. 385-90.) Dr. Neiger noted that Green had swelling of

both lower extremities, consistent with lymphedema, and that testing revealed left iliac and femoral-popliteal arterial occlusive disease.  (Tr. 385-86).  Dr. Neiger noted that conservative treatment with use of supportive stockings had been recommended, but that Green had been noncompliant due to lack of health insurance.  (Tr. 386.)  She further noted that Green continued to smoke one and a half pack of cigarettes a day.  (Tr. 387.)  Dr. Neiger adopted the findings set forth in the ALJ's June 2003 denial decision on Green's prior application for benefits per Acquiescence Ruling 98-4(6) (adopting the Sixth Circuit's ruling in *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), that where a final decision of the SSA after a hearing on a prior disability claim contains a finding of a claimant's residual functional capacity, the SSA may not make a different finding in adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim unless new and additional evidence or changed circumstances provide a basis for a different finding of the claimant's residual functional capacity).

Office notes from the Internal Medicine Department of St. Elizabeth Medical Center indicate that Green continued to be treated for leg pain in 2004 and 2005.  (Tr. 392-409.)  The office notes document peripheral vascular disease,[7] hyperlipidemea, coronary artery disease, leg numbness, hypertension, migraine headaches, sleeping problems, difficulty breathing, and tobacco abuse.  (*Id.*)  Notes from October 19, 2004 indicate that Green reported he cut back his smoking to a half pack a day for the past three months.  (Tr. 403.)  Notes from April 27, 2005 indicate that Green was "able to do only minimal exercise," that he had been "smoke-free for

---

[7]Arterial occlusive disease is a type of peripheral vascular disease.  *See The Merck Manual*, 1764 (17th ed.1999).

two months," and that his peripheral vascular disease was stable on a conservative regimen."

(Tr. 399-400.)  Notes from August 23, 2005 indicate that Green's peripheral vascular disease

was severe, that Green was continuing conservative treatment, and that Green was "maybe not a

good candidate for surgery."  (Tr. 395.)  Notes from November 29, 2005 indicate that his

peripheral vascular disease was stable.  (Tr. 392.)

In January 2005, Dr. Kollipara noted that Green complained of numbness extending

from the hip to the ankle, which Dr. Kollipara believed was most likely of neurological etiology

and referred Green to his primary care physician for evaluation.  (Tr. 423.)  Dr. Kollipara

recommended that Green stop smoking completely and take his medications and one aspirin

daily.  (Tr. 423.)

### Hearing Testimony

A hearing was held on May 25, 2006, during which Green testified as follows.  His last

job was in a recycling center sorting trash.  (Tr. 461.)  That job required him to lift between 10 to

25 pounds and to stand eight hours a day.  (*Id*.)  He stopped working at the recycling plant

because the company went out of business.  (Tr. 463.)  When the ALJ asked Green when he

stopped working , Green replied that he did not know.  The ALJ indicated that he had before him

several dates – June 19, 2001, June 21, 2001, and June 30, 2003 – and asked Green's counsel

when Green's disability onset date was.  (*Id*.)  After some discussion, counsel stated that the

onset date was June 25, 2003, the day after the prior unfavorable decision.  (*Id*.)

Green further testified as follows.  He has lived in an apartment with a friend for the past

sixteen years.  (Tr. 458.)  He has never had a driver's licence because he "can't judge when to

turn" and "flunked driver's ed."  (Tr. 459)  He does not vacuum, mop the floor, or cook, but

10

does laundry once in a while and scrubs the bathtub once a month, although it causes him pain. (Tr. 463-464).  He shops for groceries with his roommate monthly and is usually in the store for about half an hour.  (Tr. 464.)  He does not go to church or to the movies, does not play sports, go fishing or camping, do volunteer work, or belong to any organizations or clubs.  (Tr. 464-65.) Sometimes, he walks every day for five to ten minutes, but that is the most he can do before his legs start hurting.  (Tr. 465.)  He has no hobbies except playing Pokemon, a hand held game, which he plays for about an hour and a half per day.  (Tr. 365, 377.)  He leaves the apartment to socialize "maybe once a month."  (Tr. 475.)

When asked what prevents him from working, Green testified as follows.  His legs hurt when he walks or picks up anything heavy.  (Tr. 471.)  Lifting almost anything makes his legs hurt.  (Tr. 473-474.)  He can stand, at most, ten to fifteen minutes at a time because his legs start to swell and hurt.  (Tr. 473.)  He experiences numbness and tingling from his knee to his hip when he sits.  (Tr. 471).  This occurs all the time.  (*Id.*)  He also has hypertension, which causes chest pains, sometimes two to three times a day if he is nervous.  (Tr. 473.)   He has shortness of breath that is triggered by walking, pain, and lifting.  (Tr. 474.)

Green testified that he took the following medications: Amitriptyline for depression and to help him sleep; Isosorbide, Lopressor, and Nitro-Quick for his heart; Lipitor for cholesterol; Plendil for his legs; Albuterol and Advair for asthma; Neurontin for nerve damage from shingles; and Loratadine for allergies. (Tr. 467-70).  He testified that in the preceding year, he used NitroQuick for his heart "maybe five times."  (Tr. 469.)

When the ALJ asked Green how he would describe his concentration, Green replied, "I don't know what you're talking about."  (Tr. 477.)  The ALJ then asked Green what he did

throughout the day and how he spent his time.  Green testified that he sits on his back porch and

"just sit[s] there and think[s] about his past and what's going on around [him.]"  (*Id*.)  In the

winter, he stays in the house and plays Pokemon for about an hour and a half and watches

television during the day.  Green further testified that he can read, but does not understand the

words and that once in a while he reads the Bible.  (Tr. 478-79.)

### III.  Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the

time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments,

which can be expected to "result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

Green was insured on his alleged disability onset date, June 25, 2003 and remained

insured through December 31, 2005.  (Tr. 16.)  Therefore, in order to be entitled to DIB, Green

must establish a continuous twelve month period of disability between June 25, 2003 and

December 31, 2005.  Any discontinuity in the twelve month period precludes an entitlement to

benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d

191, 195 (6th Cir. 1967).

A claimant is entitled to receive SSI benefits under the Act when he establishes disability

within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Secretary of Health and Human

Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform

"substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

12

last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI

benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§

416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ made the following findings.  Green had not engaged in substantial gainful

activity since the alleged disability onset date.  (Tr. 20.)  Green established the following severe

impairments: coronary artery disease with a history of myocardial infarction; bilateral femoral

arterial occlusive disease; hypertension; tobacco abuse; and, borderline intellectual functioning.

(*Id.*)  Green's impairments, either singularly or in combination, did not meet or equal an

impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 21.)  Green's allegations regarding

the intensity, persistence, and limiting effects of his symptoms were not totally credible.  (*Id.*)

Green had a residual functional capacity ("RFC") to perform medium work that was further

limited to simple repetitive tasks.  (*Id.*)  Green could perform his past relevant work as a sorter at

a recycling center.  (Tr. 23.)  On the basis of these findings, the ALJ determined, at step four of

the sequential process, that Green was not disabled.  (*Id.*)

### V. Standard of Review

Because Green's request for review has been rejected by the Appeals Council, the

decision of the ALJ is the final decision of the Commissioner and is subject to this Court's

review.

The Court's review of the Commissioner's decision is limited to determining whether

there is "substantial evidence" to support the Commissioner's decision and whether the

Commissioner employed proper legal standards in reaching his or her conclusion.  Substantial

evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *see also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  If substantial evidence for the Commissioner's decision exists, the Court's "inquiry must terminate" and the final decision of the Commissioner must be affirmed.  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  If the Commissioner's decision is supported by substantial evidence, the Commissioner's determination must stand regardless of whether the reviewing court would resolve the disputed issues of fact differently.  *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

## VI.  Analysis

Green presents the following claims: (1)  the ALJ erred in failing to consider the limitations of Green's borderline intellectual functioning on his ability to control his disease and on his ability to function in the workplace; (2) the ALJ erred when he found that Green could perform his past relevant work as a sorter in a recycling center; and (3) the ALJ erred when he found that Green's claims were not entirely credible.

### A.  Failure to Consider Limitations of Borderline Intellectual Functioning

Green's claim that the ALJ failed to consider the limitations of Green's borderline intellectual functioning on his ability to control his disease and on his ability to function in the workplace is not persuasive.  The ALJ specifically considered the effect of Green's mental limitations on his ability to control his disease when he discussed Green's failure to comply with his physician's recommendation to stop smoking and walk as much as possible.  The decision

14

states, in relevant part, "Because the claimant's borderline intellectual functioning may diminish his ability to understand the importance of the conservative care instructions to walk and stop smoking, the undersigned has not dismissed the claim in this regulatory basis alone." (Tr. 22.)

To the extent that Green argues he cannot work due solely to his mental limitations, that claim is not supported by the record. Both the psychological consultative examiner and the state agency reviewing psychologist concluded that Green could perform simple repetitive tasks in an environment that required him to have minimal contact with the public and coworkers and had some level of supervision, could adapt to routine changes that do not occur often, and could follow very basic written instructions. (Tr. 351, 354.)

Green also argues that the ALJ erred in failing to find that Green satisfied Listing 12.05(C), the listing for mental retardation. Listing 12.05(C) provides, in relevant part, as follows:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, *or* D are satisfied.
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05(C).

The claimant bears the burden of proving his condition meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hale v. Secretary of Health and Human Svcs.*, 816 F.2d 1078, 1083 (6th Cir. 1987). To

support a claim of disability based on a listed impairment, a claimant must demonstrate that his condition satisfies all of the requirements of the pertinent Listing, including any diagnostic description in the introductory paragraph of a Listing. *See* 20 C.F.R. § 404.1525(c), (d); *Hale*, 816 F.2d at 1083. Green must demonstrate that he satisfies the diagnostic description for Listing 12.05 in order to be found disabled thereunder. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A) ("Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation . . . . If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing."); *Foster v. Halter*, 279 F.3d 348, 354-55 (6th Cir. 2001) (claimant could not meet 12.05C where she failed to satisfy the diagnostic description).

The record contains no evidence that Green was ever diagnosed with mental retardation. The state agency reviewing psychologist opined that Green's allegation that he was mentally retarded was not credible. (Tr. 354.) Although testing reveals that Green had a full scale IQ of 69 in 2004 and the ALJ found that Green suffers from several severe physical impairments, such that paragraph C is satisfied, Green has not demonstrated that his impairment initially manifested in the developmental period. Although Green had an IQ of 69 in the third grade, which would indicate significantly subaverage general intellectual functioning, Green's IQ score exceeded the 60-70 range in the eighth grade, with a verbal IQ of 71, performance IQ of 94, and full scale IQ of 86. (Tr. 135.) Green also bore the burden of demonstrating deficits in adaptive functioning during the developmental period. Aside from his IQ score, he points to no evidence of such deficits. Accordingly, the ALJ's finding that Green failed to meet the criteria for any mental listing is supported by substantial evidence in the record.

16

**B.  The ALJ's Credibility Determination**

The ALJ's credibility determination is not supported by substantial evidence and the ALJ

failed to follow the proper procedure in making his credibility finding.  When an individual

alleges disabling symptoms, 20 C.F.R. §404.1529 requires the ALJ to follow an outlined process

for evaluating these symptoms.  First, the ALJ must determine whether objective medical

evidence supports the claimant's allegations regarding the disabling effects of the impairment.

*Id.*  If the ALJ finds that the objective medical evidence does not support the claimant's

allegations, the ALJ may not simply reject the claimant's statements, but must consider them in

light of the entire record.  *Id.*   In assessing the credibility of statements, the ALJ must look to the

relevant evidence in the record.  *See* SSR 96-7p.  Beyond the medical evidence, the ALJ should

consider seven factors, as they may be relevant to a particular claim.[8]  The credibility

determination must contain specific reasons for the finding, "supported by evidence in the case

record, and must be sufficiently specific to make clear to the individual and to any subsequent

reviewers the weight the adjudicator gave to the individual's statements and the reason for the

weight."  SSR 96-7p.

In this case, the ALJ found that Green had the RFC to perform medium work which is

---

[8] The seven factors are: (1) individuals daily activities; (2) location, duration,
frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate
the symptoms; (4) type, dosage, effectiveness, and side effects of any medication the
individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other
than medication, the individual receives or has received for relief of pain or other
symptoms; (6) any measures other than treatment the individual uses or has used to
relieve pain or other symptoms; and (7) any other factors concerning the individual's
functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §
404.1529(c)(3); SSR 96-7p.

further limited to simple repetitive tasks.  In reaching this finding, the ALJ stated that he

considered the medical evidence in the record, as well as Green's allegations.  The ALJ found

that Green's allegations concerning the intensity, persistence, and limiting effects of his pain

were not entirely credible.

After setting forth portions of the medical record,[9] the ALJ's decision states as follows:

> The severity of symptoms alleged is not reasonable based on the objective
> medical evidence and the signs on examination.  The treating physicians
> recommended that the claimant stop smoking and walk as much as possible.  The
> claimant has not complied with these instructions.  The fact that the claimant has
> not followed prescribed treatment could invalidate his claim for benefits.
> Because the claimant's borderline intellectual functioning may diminish his
> ability to understand the importance of the conservative care instructions to walk
> and stop smoking, the undersigned has not dismissed the claim in this regulatory
> basis alone, but has assessed the claimant's residual functional capacity based on
> the medical evidence of record.

(Tr. 22.)  The ALJ then noted that two non-examining state agency physicians opined that Green

could perform medium work.  If a claimant is found to perform medium work, the claimant is

able to perform light and sedentary work also.  § 404.1567(c).  A job classified as light work

"requires a good deal of walking or standing, or . . . involves sitting most of the time with some

pushing or pulling of arm or leg controls."  § 404.1567.  Thus, in order to perform medium work,

among other things, a claimant must be capable of  "a good deal of walking or standing."

The ALJ accorded significant weight to the state agency physicians' opinions that Green

could perform medium work because he found that "there [were] no objective findings or signs

on examination that indicate greater restrictions or limitations."  (*Id.*)  This finding is not

---

[9]This is the first and only portion of the ALJ's decision that sets forth any portion of the
record.

supported by the record.  The record contains a great deal of objective evidence that Green suffered from swelling and pain in his legs due to his vascular disease and that he could not perform a job that required him to be on his feet all day.  When Dr. Kollipara evaluated Green for swelling in his lower extremities, he found "edema of both lower extremities."  (Tr. 347.) After a Doppler study revealed evidence of left iliac and bilateral femoral-popliteal arterial occlusive disease, Dr. Kollipara strongly urged Green to wear support stockings.[10]  (*Id*.)  On examination, Dr. Lahkani noted purple discoloration of the left toes and that the toes of both feet were cold.  He further noted that a straight leg raising test gave Green pain in both thighs.  (Tr. 289.)  Despite the ALJ's finding that Green suffered a severe impairment due to bilateral arterial occlusive disease, he failed to discuss any of the medical evidence relevant to the disease; he simply concluded that no such evidence existed.[11]

The ALJ accorded little weight to the opinion of the consultative examiner, Dr. Lakhani, because the opinion was "inconsistent with the medical evidence of record, specifically, the treating physician's recommendation to walk as much as possible."  (*Id*.)  The ALJ's explanation is wanting and is not supported by substantial evidence.  First, although Dr. Lahkani opined that

_____

[10]When a treatment that can restore a claimant's ability to work is prescribed and the claimant fails to follow the treatment "without good reason," disability benefits may be denied.  § 404.1530.  However, the record contains evidence that Green did not wear the stockings because he could not afford them.  (Tr. 346.)  A claimant's inability to afford treatment may constitute justifiable cause for failing to comply with prescribed treatment. SSR 82-59, 1982 WL 31384, at *4.

[11]Although, prior to his conclusory analysis, the ALJ recited some evidence related to Green's vascular disease, simple recitation of facts without a discussion of how those facts support a conclusion cannot substitute for a legal analysis.  Moreover, the facts listed by the ALJ do not support a finding that Green's complaints were not credible.

"[b]ased on objective findings, [Green] could walk very short distances,"  (Tr. 290), the ALJ did not discuss the objective findings upon which Dr. Lahkani's opinion was based; he simply concluded that the opinion was inconsistent with the medical evidence of record.  Second, a recommendation to walk as much as possible is not inconsistent with an ability to walk only very short distances.  The ALJ's statement to the contrary is a *non-sequitur*.  Indeed, a recommendation to walk "as much as possible," necessarily suggests at least some limitation in the ability to walk.

The ALJ referred to only two other facts to support of his credibility finding, neither of which does so.  First, the ALJ noted Green's testimony that he stopped working because the recycling company went out of business.  (Tr. 23.)  However, Green's application states that he stopped working because he became disabled.  In addition, Green's reason for terminating his employment at the recycling plant in 2001 is not particularly relevant in light of the fact that Green's alleged onset date is June 25, 2003, two years after he stopped working.  (*See* Tr. 436.)

Second, the ALJ noted that "as of [Green's] last examination, his CAD was stable and the ejection fraction was only slightly reduced."  (Tr. 23.)  Evidence that Green's coronary artery disease was stable, without more, does not support a finding that Green's allegations lacked credibility.  Green's primary complaint, throughout the record and at the hearing, was that his legs hurt from standing and walking.  Although he alleged that he could not walk, in part, because he became short of breath, he consistently alleged that he could not walk due to pain in his legs.  The medical record is replete with evidence that the pain in Green's legs was a symptom of his arterial occlusive disease, but the ALJ fails to discuss the symptoms caused by this disease.

In addition to the lack of substantial evidence to support the credibility finding, the ALJ failed to discuss the factors set forth in § 404.1529.  Therefore, the ALJ failed to follow the correct procedure for making a credibility determination.

**C.  The ALJ's Finding That Green Could Perform His Past Relevant Work**

Based on the finding that Green had the RFC to perform medium work, the ALJ found that Green could perform his past relevant work as a sorter in a recycling center.  For the reasons discussed above, the finding that Green could perform medium work is not supported by substantial evidence.  Accordingly, the finding that Green could perform his past relevant work is not supported by substantial evidence.

## VII.  CONCLUSION

For the foregoing reasons, the final decision of the Commissioner is **VACATED** and the case **REMANDED** for further proceedings consistent with this opinion.


*/s/ Nancy A. Vecchiarelli*
United States Magistrate Judge

DATE: May 6, 2008

21